May it please the Court, my name is Robert Powell. I'm attorney for the plaintiffs, essentially the entire O'Neill family, except for Danny, a stepfather, and accompanied by Sam Park, who's co-counsel in this matter. We feel this case is an indication that no matter what this court does, the kind of judicial deception is going to continue. In our brief, we've given you six cases. There's several more. It is being resoundingly said, stop lying, and it's not being heard. In this case, one of the biggest issues in the small group of colleagues who do this work seems to be the safety plan. With respect, sir, I wrote a case not too long ago that did just the opposite. But in that case, we had definite facts that backed it up with materiality. And what I struggle with in this case is you make these allegations, and they're serious allegations. There clearly was some misrepresentations, but you've got to show that this was not, you know, it's got to be intentionally or recklessly done, and that's what I'm missing. Where is that information? We have information in the brief about Mrs. Starks, all the things that she left out that she definitely wasn't aware of. And I can see that. There are a number of things she left out, but there are lots and lots and lots of things that were in that the trial judge, the judge that issued the warrant, could have looked at and said, that's enough. So what I'm struggling with is why is what was left out so material that it constitutes judicial deception? As judges, we hear lots of things. Lawyers are there to advocate for their clients, and they will put the best spin on it they possibly can. That's their job. But what I'm struggling with here is why was this misrepresentation? And there was some material. I don't get it, so help me with that, please.  First, I appreciate the court's acknowledgment that there are material misrepresentations. We do. At least I do. And we did have those in there. Why, when you ask about the material, you're talking about the particular failure to, the untruth about the safety plan, that untruth, is that the one you're specifically asking about? And yet a day or two later, there was an email back to remind them about the very thing you're talking about, and it was contrary to what you're saying. So there might have been confusion. These folks have a tough job. They really do. And maybe there was some miscommunication, but materiality, deception, help me with this, please. I will help you with it. So understand, up until the date of the 12th, when they acted upon the warrant that was obtained on the 8th, we had children who had been in the care of their grandparents doing fine. No problem. No violence. No nothing. Parents visiting, according to Ms. Cantanillo, whose statements to the social worker are not expressions of fact and should not be treated as such. They're just like a general conclusion. So we have the children who are doing fine. Now, Ms. Cantanillo appears upset. She gives her expression of the children are being coached. Nothing's changed. That's the only thing that's changed. There's not a factual assertion about it. There's no effort by the social worker. I think it's reckless when you're still in an investigation, because remember, Mrs. Starks says that the reason that they're not supposed to be around the parents that much is so that they don't ruin the investigation, and then say, oh, I didn't think it was material that I pay attention to the safe interview of the child by the skilled professional. Remember, with respect, counsel, the law, as I understand it, is you've got to show that the missing or incorrect information in this case was such that when you consider all the other information that the judge who issued the warrant had, that the result would have been different, right? Do you agree with that? Isn't that the standard? Generally, yes. Okay. So help me with that. In what way would the result have changed if the information that you talk about had been accurately presented? Well, what happened here was exactly what Liston talks about, what Scanlon reiterated recently, is the denuding of the meaning of the probable cause requirement. There is a lengthy list. I thought about asking if I might just go through it. I can do it pretty quick, even though to make sure that we are. It's your time. We're excited to hear everything you want to say. Excited. All right. The three officers come out. They leave, take no children. We think that is hugely material. Three trained law enforcement officers come out, don't take the children. Their report is quoted, and yet the court is not told that no children were taken. They were left in the home with the parents. There's no marks on the child, D.O. There are pictures in the record. His neck is pristine, which is impossible, and that's on the night of the call. All the children feel safe at home. And let me point that out. In every other area of this child dependency litigation, which only I and about 11 other people in the state of California do, it is a particularized approach. You don't just say, oh, I'm taking your one kid. I'm taking them all. The truth of the matter is they do, but that's a case that's on its way to you now. All of them feel safe at home. Original referral evaluated out. You don't think the judge would want to know that? Wait a minute. You guys heard about this case, and you evaluated it out, and now you want me to issue a warrant to have the kids taken from their home? They're very home. Okay, counsel, but I'm still not seeing how any of this is relevant to whether or not Starks intentionally or recklessly lied. Well, don't you think the sheer number alone is indicative of reckless disregard? I think it's more behind the scenes. I mean, it seems to me, looking at the evidence, she legitimately thought that there was a safety plan, and it just failed to make it to the document that was given to the family. Then we have a tribal issue of material fact on that, and that's what we briefed in our case as well. Well, I mean, the problem is I don't see any counter evidence to show that there was recklessness or intentionality. I mean, do you have any evidence of intentionality, that you lied on purpose? Yes, we do. Which is what? We have a delivered service log entry that says it was there, and then we have the safety plan, which it isn't there. And that right there indicates that there was some effort to, or the inference that we're entitled to as the nonmoving party, is that that was an intentional act. It was at least reckless disregard. Well, I'm not sure about that. I think you need a little bit more. I mean, it could be you. It's a big deal when the thing goes to the court, and what they're arguing in their papers is that, oh, it's not a big deal, and yet that is what triggered. I think it was a big deal, but the problem is I just don't see it, any evidence of recklessness or intentionality, which is what you need to prove, correct? Well, we have to show a substantial showing of reckless disregard for the truth, right, or omissions, which, if you'll notice in the list of things, if I may continue, it's going to be all about omissions, because as someone who practices in this area, that's the preferred way to lie. And that's why I asked the court to consider how many we're talking about here. It's not a little. It's a lot. Counsel, can you tell me about the change in the electronic case file that you're arguing a jury could infer happened recklessly or misleadingly? Yes. Was the testimony just that it's possible to edit these things, or did you have any facts you could point to that this had been done in this case? Well, no, we can't show that it's had been done because, unfortunately, that's beyond the reach. The system that stores these delivered service logs only maintains them for 20 days, where you could check that metadata. That's what I'm getting at. Is there any way for you to check that in discovery? Believe me, again, this is an area I've been fighting in for 27 years. Wish to God I could get them to keep that data because we would find it all the time. I've uncovered it in other cases because someone admitted it. That's very rare, however, in these cases. So I do ask the court to look at this. The admission is rare. Yeah, people admitting that they've done wrong. Just a few more of these things. In response to my colleague's question, then, you are saying, you simply allege that it was possible to make a change, but you have no evidence that change was made electronically. Is that right? That's correct. But we do have three other people there present whose testimony is in saying that the safety plan did not have that information in it. And when does the call come about this or the text? It's a text. When does the text go to the parents? It's after Cattaneo calls. And do you see any evidence in the text where she asks the very simple question, hey, are you following the plan? She doesn't do that. That also deserves for us, I believe, an inference of something else is going on, something else is afoot. That certainly is a suspicion. But as we've all pointed out here, you have to reach a much higher standard. You have to show intentionality or certainly serious recklessness. And where is that evidence? Well, I believe that this does weigh in at the very least as reckless disregard for the truth and the whole failure to even attend the safe interview when the complaint is, oh, we don't want you staying with the kids all the time because, you know, then you might compromise our investigations. But then Stark sits in her office when she could have went, could have clicked and watched the safe center interview. Does that, to me, that screams reckless disregard. When you're talking about ripping families apart, we had four children taken from these, from this mother, four children. But the problem is, like, the warrant said that he was choked. The sister called the police because he was being choked. And then, and it's not disputed that this type of, that there has been incidences of violence in the past. So to me, that's enough to find probable cause. Well, it is if you leave out the fact that the child denied being injured, which he told to Stark's face on December 24th. He told that to Stark's face. I was not injured. And, in fact, the fact of failing to do your investigation, do a reasonable investigation, something about reasonable investigation, which seems to be so important under this law, under Wallace v. Spencer and all the other warrantless cases, May v. Kennedy, San Bernardino, seems to have somehow got lost when it comes to the investigations before you seek a protective custody warrant. I don't know if the Court's aware of this. I assume Judge Smith is. Been here a while. There was an epic of the warrantless removals going on for decades until, again, me and 10 other people put a foot down. That took 10 years from when we started until that stopped. Now we see this. We see warrants absolutely filled, which is a funny word because omission is the route, and there's just a couple more. May I about the omission? Actually, no, since you've got a rebuttal coming up, we're going to have to let your colleague do that for you. Unless either one of my colleagues has questions for you. Very well. Hopefully I've stressed the link. Thank you for your presentation. So I guess we're going to hear from Mr. Smith from the County of Sacramento. Good morning, Your Honors. My name is J. Scott Smith. I represent the defendant, Karen Starks, who was the one who filled out the warrant application. I think one of the things, and you heard counsel repeat it here today, he referred to, well, she didn't conduct a reasonable enough investigation. She didn't go to the safety center meeting, didn't watch the safety center meeting. That's not what she's being sued for. She's being sued for judicial deception. The warrant application on those points makes clear, doesn't say that it, so when it talks about her knowledge of the events of what occurred, it makes clear that it comes entirely from Detective Cotillano. It says that. Detective Cotillano called me and said it appeared that they're being coached and it appears that the grandmother is living with them for up to six months. Now, we do know that the log entries, which there's testimony that they're supposed to be entered contemporaneously, state that she thought she'd talked about a safety plan where the parents would be substantially separated, which is, after all, the entire point. When she agreed, when the social worker agrees to have the children put back into the home so that they could be with the grandmother and living at home, go to school, have a relatively normal life, the idea is to create a separation. So why was that not in the plan given to the family? It appears to have just been a mistake. So she thought that she did tell them that any visitation had to be remote? Her recollection was that she spoke with them about it. And instead of, because if you recall that the safety plan itself just has a little written section. But it could have been very easily put that visitation should be remote or something. I don't disagree that it could have been. But it was something that was omitted, that it does, there's no, I think you were right earlier, there's no evidence that suggests that this was some kind of, you know, intentional effort to mislead the court. Counsel talks about the fact that the warrant application did not say that the AO didn't show marks or bruises. Well, it didn't say that he had either. And more significantly, to a judge doing these types of warrant applications, the lack of that statement would be apparent. And it's also not something that contradicts the statements that she received from the older sister, that this sort of thing happens, was happening all the time to the two younger children. Counsel, the best argument on the other side, though, what prompted the warrant was the fact that the agent said that the kids were being coached. Correct. Right? And in violation of the safety plan. It turns out that wasn't in violation of the safety plan. Well, being coached certainly is in violation. Sure. And that is, that's the more critical component, is that they're spending six hours a day, and during that six hours a day it appears that they are influencing the children. Counsel, wasn't there a brochure that was left telling the parents that they should talk to the children to prepare them about what's going to happen next? That isn't something that I recall that the social worker, other than to say that there will be a process going on, but it is, you know, where the statement that Detective Cadiano gave or said, you know, to the social worker was, he appears to have been coached as to what to say. And that's what she put in the warrant, is Detective Cadiano appears that he has been coached. So when you add all those combination of events together, it appears, it appeared to her from the information that she got from Detective Cadiano, that indeed they were, they may have been, that they were putting pressure on the children perhaps to cover this up. Recall that one of the statements that the older sister, AO, had. Are you essentially saying that the plaintiffs are blaming the wrong person, and they should have, they should be blaming the judicial officer who issued the warrant for not digging enough into this game of telephone, as opposed to suing your client? I think that that is, that is at the heart of their case, is that they are unhappy that the warrant was issued on what they believe is insufficient information. You know, because recall that, you know, just a few days later, there was a hearing where the parents were represented by counsel, and the court and that, and they raised these issues. And that judge looked at this and even said, made two findings. One, he made the jurisdictional finding that a prima facie case of potential abuse or neglect existed to bring the children within the jurisdiction of the, of the dependency court. And two, that the court made a specific finding that it could not see a reasonable way to keep the children safe other than their continued removal from the home. When these things were, so. But that's the other warrant that matters right here. And my thought is, you know, you're right, coaching is pretty bad. But coaching in violation of a safety plan, why doesn't that increase the badness of the situation, or at least heighten the problems with the situation so that omission was material? It, it does. And when the safety plan did, in fact, tell them that they are not to discuss. No, but the remote part is the problem. I'm sorry, what? The remote part of the safety plan was the problem. I don't necessarily think that that's, that just because it was done remotely or not remotely. It raises the specter that they're just not following the safety plan. It does raise the specter that they're not following the safety plan. But in two ways. One is in the not coaching. And two, you know, not having physical visitations or in-person visitations. Correct. But equally as important, even if you discount that there is this apparent, you know, dispute as to who remembered what, as to what in terms of the actual visitation. You know, the clear intent of a safety plan like this is to create separation. When the parents are there six hours a day talking to the children, and after spending six hours a day with the children and then getting a, learning that and then learning from a telephone call from the, from the Detective Cardiano saying these children appeared to have been coached. Well, that creates, that creates a really strong inference that something wrong is occurring. That the children may very well be in danger. Hence. What's the standard that the judicial officer had to reach to issue the removal? Is it may well have been in danger or worry about being in danger? The standard is that there's probable cause to, it's a probable cause standard. So it's a greater. So to what? Probable cause for what? Probable cause that the children are, that the children are at risk, that the children are in danger of, of, of. Serious physical. Serious physical or emotional abuse ongoing. And that's, that's the standard that the judicial officer has to make. And the judicial officer makes that by looking at a warrant application that clearly states that, in that last part that she's making these, she's bringing this warrant because of something that a detective told, told her about something that occurred during a safety meeting. Let me just ask this then. Do you think that a fact finder on these claims could make any sort of inference of recklessness at least, or maybe intentionality when the virtual nature of a visit would, when the parents or the alleged abusers would seem to be the critical thing to do to prevent this substantial risk of abuse, right? And for that not to be written down, this wasn't about, you know, it needs to be daylight hours or working hours. This was, will the alleged potential abusers be in the home? Do you think that just the importance of that fact could support a tribal issue? I don't think, I don't believe so, because I think that there isn't any evidence of a lack of intentionality. And I also don't believe that there's any evidence that that suggests a question of material, that that affects the materiality of this. When it turns out that the safety plan, whether appropriately communicated or not, is not effectively creating separation between the parties. And that lack of separation is leading to apparent coaching. When you combine that with the, what was actually said, both to Ms. Starks when she interviewed the children, and to the officers when they investigated it, that this was, that there was a long history, A.O. said that, A.O. reported a story where the mother had, a month or two earlier had pushed, had pushed her little brother down. And then in that instance tried to cover it up by saying he fell out of bed and cracked his head open. She described being held up against the wall and, quote, smacked in the face. So when you, and that she had been beaten so hard with a belt that she had to go to school wearing trousers so that the bruises wouldn't show. Counsel, let me ask you this. Speaking just for myself, I find that there are probably six different things that were communicated to the judge that were, or not communicated, that were arguably errors, arguably inaccurate. But the judge went ahead and issued the warrant anyway based upon other testimony. Is the standard that the judge used there basically taking what she knew at that time, whether there was probable cause based upon what was before that judge? Is that what we're looking at? Or is it if the other information were also presented it would have changed the result? Well, the standard we're looking at is whether, if you're, well, if you're addressing, are you asking the question of whether or not the information is material, the omissions that is a material? Basically what I'm looking at, I ultimately want to get to qualified immunity. In other words, basically this seems to be a kind of a wishy area, a difficult area. There's no clear black and white issue. So let me just ask you, point blank, is under any circumstances would a case like this succeed in light of qualified immunity since the issue of the constitutionality is unclear? I don't think it does. I mean, the qualified, because under this instance what you're talking about is what information does, this is not any of the circumstances of the cases that were cited in plaintiff's brief or their reply brief. This isn't like the Los Angeles County case where you had a social worker who was found to be intentionally committing perjury, not only that, and suborning perjury. And a jury had previously found that. This is an instance where is a social worker writing this warrant out? Is she constitutionally compelled to include, oh, I should add into this, even though I don't think it's relevant because of all the other information I have. But what about the information that the judge was not aware of? Does that matter? It doesn't change the qualified immunity analysis. Because a qualified immunity analysis focuses on the constitutionality and unconstitutionality of her action and whether or not that was clear. Okay. We'll let you go over time. Let me ask my colleagues, do either have additional questions? I think not. Thank you very much. We're going to hear now from your colleague, Mr. Paul. I gather you represent the county. Is that right, Mr. Paul? No, Your Honor. For clarification. We can't hear you. We're not hearing you. County of Sacramento. Now we can hear you. Okay. The County of Sacramento was dismissed and plaintiff did not pursue the county on appeal. For today's proceedings, I'll be representing appellee Sasha Smith. Okay. Please proceed. May it please the court. Jonathan Paul on behalf of appellee Sasha Smith. This morning, I'll be raising two points. First, that the appellants did not raise the argument of supervisory liability in opposition to the motion for summary judgment. And it should not be heard for the first time on appeal today. Second, as stated in Hartsell versus Marana Unified School, excuse me, not second, but as stated in Hartsell versus Marana Unified School District, arguments not raised in opposition to a motion for summary judgment are waived. Appellants did not argue in their motion for summary judgment opposition or during briefing at the motion for summary judgment hearing that Ms. Smith was liable as a supervisor for the acts of her subordinate, Karen Stark. Notably, in their opening brief, they cite to Maxwell versus County of San Diego for the proposition that a supervisor can be held liable for the acts of their subordinates if various acts are established. However, no such citation can be found within their opposition papers in the motion for summary judgment. Hence, it's clear that their theory of supervisory liability against Sasha Smith is raised for the first time on this appeal and the court should decline to hear those arguments. Secondly, even assuming that those arguments were not waived, appellants still cannot establish that Smith's liability for Smith is a supervising social worker because she had no knowledge of the misrepresentations and omissions allegedly made by Starks. As stated by the Maxwell Court, a supervisor can only be held liable for the acts of their subordinate if the supervisor knew of the subordinate's acts, knew that the consequences of those acts would be a violation of plaintiff's rights and the supervisor failed to act to prevent their subordinate from engaging in such acts. Appellants have contended that Smith reviewed the safety plan, knew there was no mention about virtual visitation, confirmed that the terms of the safety plan must be in writing, and she knew it was possible for a social worker to change an entry in the CWS CMS system. Mere knowledge that a change can be made in the CWS CMS system does not logically support a finding that Smith knowingly ignored material misrepresentations in the warrant application that would have violated the appellant's rights. As was pointed out earlier in argument, there is no evidence in this case that there was actually a change to the records in the CWS CMS system. There's certainly no evidence that Smith was aware of any such change if it had occurred. Smith was Stark's supervisor. Her role was to discuss the case with the handling social worker, and when Stark drafted the reports for submission to the court, that's exactly what she did. She did not interact with or communicate with law enforcement. She did not review the delivered services logs, the audio recordings, video recordings, or police reports prior to signing the detention report. Smith was unaware that Dio had recanted and denied that his mother had choked him until the day of her deposition. Thus, appellants cannot show that Smith had knowledge of the alleged misrepresentations and omissions by Starks, and they do not cite any evidence to suggest that she had any reason to doubt Stark's representations within the protective custody warrant application. Okay, your time is up. Let me ask my colleagues any additional questions. Very well. Thank you, Mr. Paul. We now will hear rebuttal from Mr. Park. Thank you, Your Honor. May it please the Court, my name is Sam Park, and I also represent the plaintiffs. Your Honor, when we look at the custody warrant, the box that was checked under 3b was that the children are in imminent danger of physical or sexual abuse, and there are no reasonable means by which the children can be protected without temporary removal from the physical custody of the parents or children. There are five plaintiffs in this case. It's Fawn O'Neill and her four children. Two of the children, Dio and Ayo, there was some evidence or there was some information that they had been physically abused in the past. The other remaining two, A.T. and B.T., there was no such evidence at all. And so taking a look at this custody warrant as a whole, there is nothing in here that would establish probable cause that either of those two children were in. So is it your position that if, and this is arguendo, let's assume that there was really strong evidence that two out of five children had been terribly abused, is it your position that you have to leave the other three children there because there's no direct evidence that they have as yet been abused? I do believe that a particularized analysis would need to be undertaken for each child. So if there is a case law on that is where? I don't recall off the top of my head. I want to say it may be Keats v. Coyle, but that was a warrantless removal case. But it's in one of the warrantless removal cases I do recall that there is a particularized analysis. What I struggle with on this, I have a lot of kids of my own, and when you have a family unit, you've got people being removed in part for alleged abuse. To leave the others there kind of defies logic to me because it's kind of an accident waiting to happen if you believe the allegations. And, of course, this is just a warrant. So I'm not sure I'm comforted by your idea that everybody shouldn't have been included. Your Honor, I think there are different sorts of family dynamics. There may be cases where certain children may be more at risk than others. Oh, of course. And so I do think that that sort of analysis needs to be undertaken. But that's an analysis that the judge has to do, and you've not charged the judge. You've charged the, if you will, the charging officer. Correct, Your Honor. The other thing I'd mention is that at the detention hearing, the judge is only looking at prima facie evidence, essentially looking at the sufficiency of the charging allegations. It's not an evidentiary hearing. So I know that the defendants are relying on the fact that the judge continued the detention at that point. Again, that's the fault of the judge, right, not the charging party. Well, I don't know that it's the fault of the judge. It's the information that's presented to the judge and whether that's complete or not. In this case, for example, on the safety plan, the county's own policies indicate that everything must be in writing in the safety plan. Let's just assume that that was not done correctly. And it wasn't done. And by the time that they loop around and confirm and try to memorialize this in a telephone call to say that, oh, yeah, by the way, there are these additional terms, you remember, right? Well, at that point, Ms. Starks knew to a certainty that those terms were not in the written safety plan. That's right. You're running out of time. So let me just ask you point blank. Why is this case not covered by qualified immunity? So there's no question. I think it's David versus Kaluki-Kui, I think, that says that it's beyond debate, that you cannot act, you cannot perpetrate acts of judicial deception and be entitled to qualified immunity. I think even Chisholm says that. Oh, if indeed you have done that. But the question here is, like so many things that we deal with, this is not black, white, black, white. It's a mush. We've got different perspectives, different views, different allegations about what happened. And if we conclude that what we have here is mush, then you don't meet the requirements for Pearson, do you? So I guess what I was trying to point out was just on the issue of whether the law is clearly established or not. I know that there's some question about that. I think this case turns on materiality and whether or not plaintiffs have been. And materiality is not the issue under qualified immunity, is it? I don't believe it is. Okay. So I get back to my original question. If it's not clear that a constitutional violation has occurred, then the people you're charging have qualified immunity, right? I don't know if they'd be entitled to qualified immunity. I think what would happen under those circumstances is that the plaintiffs simply haven't carried their burden of proof. I don't think you're answering my question. You're artfully dodging it. But isn't the answer they would be entitled to qualified immunity? Under those circumstances? Where it's murky. In other words, basically if the law is really clear and somebody willfully violates it, then they don't have qualified immunity. But the law has got to be clear. And the able counsel that you're with and other side, everybody's arguing, and it's not clear. There's discussion and debate about who did what, whose responsibility is what. So if it's not clear, aren't these folks entitled to qualified immunity? So what's unclear may be the facts of the case, but the rights that are at issue are clear. The right to familial association is clear. The right not to be lied about and perjured and have the submission of perjured testimony was clear. There may be some factual disputes, but, again, I think the weight of the evidence suggests that. Okay. Very well. Thank you, Your Honor. Other questions by my colleagues? All right. Thanks to everyone. I know you feel very strongly about this, as you should. We appreciate your advocacy for your clients. And the case just argued of O'Neill v. County of Sacramento et al. is submitted.
judges: SMITH, BUMATAY, Barker